## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LINDA WILKINS, LAKEESHA EMERSON,
and TYEESHA EMERSON,

Case Number:  04-CV-73276

                 Plaintiffs,

JUDGE PAUL D. BORMAN
UNITED STATES DISTRICT COURT

v.

THE CITY OF ROYAL OAK, a municipal
corporation, THE COUNTY OF OAKLAND, a
municipal corporation, and MICHAEL
FRAZIER, Badge #221, MICHAEL MOORE,
Badge # 254, RYAN MCINERNY, Badge
# 251, DAVID MCLENNAN, MICHAEL
SMITH, Badge #250, Royal Oak Police
Officers,

                 Defendants.

_____ /

### OPINION AND ORDER:
#### 1)  GRANTING THE INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' § 1983 CLAIMS;
#### 2) DISMISSING PLAINTIFFS' § 1983 CLAIMS AGAINST DEFENDANT CITY; AND
#### 3) DECLINING TO EXERCISE PENDENT JURISDICTION OVER PLAINTIFFS' REMAINING STATE-LAW CLAIMS

Now before the Court is the individual Defendants' Motion for Summary Judgment on

Plaintiff's § 1983 claims against them.  The Court heard oral argument on July 7, 2005.  Having

considered the entire record, and for the reasons that follow, the Court GRANTS the instant

motion.

### I.  BACKGROUND

On August 25, 2004, Linda Wilkins ("Wilkins") and her daughters, Lakeesha Emerson

and Tyeesha Emerson, (collectively "Plaintiffs") filed the instant lawsuit against the City of

Royal Oak ("City") and Royal Oak Police Officers Michael Frazier ("Frazier"), Michael Moore

("Moore"), Ryan McInerny ("McInerny"),[1] David McLennan ("McLennan"), and Michael Smith

("Smith").[2]  Plaintiffs' Complaint alleges multiple state-law and federal-law claims arising from

events that transpired following Defendant Officers' response to a 9-1-1 call at Plaintiffs'

residence on November 13, 2001.  (*See* Compl. at ¶¶ 8-54.)

 In particular, the complaint alleges the following state-law tort claims:  gross

negligence/negligence; false arrest; malicious prosecution; abuse of process; defamation; assault

and battery; intentional infliction of emotional distress; negligent supervision; and negligent

hiring/retention.  (Compl. at ¶¶ 55-90, 108-20.)  The Complaint alleges civil rights claims arising

under the Michigan Constitution and the Michigan Elliott-Larsen Civil Rights Act.  (*Id.* at ¶¶ 91-

107.)  The Complaint pleads civil rights claims arising under the United States Constitution, as

actionable via 42 U.S.C. §§ 1981, 1983, and 1985.  (*Id.* at ¶¶ 91-107.)

 On October 25, 2004, Defendants Royal Oak and all of the individual Defendants except

for McInerny filed a motion for partial dismissal under Federal Rule of Civil Procedure 12(b)(6).

---

[1]On February 11, 2005, Plaintiff requested a clerk's entry of default against Officer McInerny on the ground that McInerny, although served, failed to plead or otherwise defend in the action. Defendant City and all individual Defendants but McInerny joined in the Answer to Plaintiffs' Complaint, filed on August 30, 2004.  On February 15, 2005, the clerk's entry of default against McInerny was entered.

 However, the Court, on April 14, 2005, issued an order setting aside the clerk's entry of default against McInerny based upon Plaintiffs' failure to effectuate service upon him.  The docket is silent on whether Plaintiffs, following that order, have served McInerny with their complaint.  Indeed, McInerny has not joined the instant motion.

[2]Plaintiffs' complaint also names the County of Oakland, Michigan, as a Defendant. However, per Plaintiffs and Oakland County's stipulation, the Oakland County Circuit Court, on August 20, 2004, entered an order dismissing Oakland County from the action with prejudice and without costs.

On March 23, 2005, the Court issued an opinion and order granting that motion.  Specifically, the Court dismissed all of Plaintiffs' state-law tort claims against the City, and dismissed Plaintiffs' claims of defamation, assault and battery, false arrest/imprisonment, and malicious prosecution against all of the individual Defendants except for McInerny.  As to the latter ruling, the Court found, as a matter of law,–and Plaintiffs conceded–that their claims of defamation, assault and battery, false arrest/imprisonment, and malicious prosecution were filed outside the applicable statutes of limitations.  (5/23/05 Opinion at 9.)  Presumably, any such claims against McInerny would, likewise, fall outside the requisite limitations' periods.

Consequently, only Counts I, IV, VII, and VIII remain against the individual Defendants.[3]  Count I alleges a claim of gross negligence/negligence.  Count IV alleges a claim of abuse of process.  Count VII alleges excessive force in violation of the Michigan Constitution; Michigan's Elliott-Larsen Civil Rights Act, M.C.L. 37.2101, *et seq.*; and the United States Constitution, as actionable via 42 U.S.C. §§ 1981, 1983, and 1985.  Lastly, Count VIII alleges a claim of intentional infliction of emotional distress.  Only Count VII remains against Defendant City.[4]  Count VII, as noted above, alleges various civil-rights claims.

Now before the Court is a motion for summary judgment by Defendants Frazier, Moore, McLennan, and Smith (collectively "Defendants"), filed on March 21, 2005.  In that motion,

---

[3]The instant summary-judgment motion contends that the Court dismissed all of Plaintiffs' state-law claims against Defendants Frazier, Moore, McLennan, and Smith.  (Br. at 3.) However, Counts I and IV plead state-law claims of gross negligence/negligence and abuse of process against the individual Defendants, and the Court's order of partial dismissal did not touch upon these counts.

[4]The instant motion asserts that the Court dismissed all of Plaintiffs' claims against the City. (Br. at 3.)  Yet, Count VII purports to allege a claim against the City, and the Court's order of partial dismissal did not bear upon this count.

Defendants contend that they are entitled to summary judgment on Plaintiffs' § 1983 claims against them based upon alleged excessive force in violation of the Fourth Amendment, as set forth in Count VII.[5]  (*See* Resp. at 2.)  Specifically, Defendants maintain that, as a matter of law, Defendants did not violate Plaintiffs' Fourth Amendment rights and, even if they did, Defendants are, nevertheless, entitled to qualified immunity.

## II.  FACTUAL BACKGROUND

On November 13, 2001, Plaintiff Wilkins called 9-1-1 to report a "domestic argument" with her husband, Keith Wilkins, and "spousal abuse."  (Wilkins Dep. at 56, 64, 66.)  Officers Frazier, McInerny, and Moore were dispatched to Wilkins' residence for a "domestic assault in progress." (McInerny Report at 1; Frazier Report at 1; Moore Report at 1.)  Dispatch advised the officers that Wilkins had stated that she had locked herself in the bedroom to keep Keith Wilkins from assaulting her.  (McInerny Report at 1; Frazier Report at 1; Moore at 1.)  Wilkins testified, however, that the dispute, which was an argument over the payment of bills, never became physical and that she simply wanted Keith Wilkins removed from the residence as an "emergency." (Wilkins Dep. at 49, 53, 65, 110-11; Resp. at 1, 3.)  Wilkins testified that she never told the police the exact nature of the dispute.  (Wilkins Dep. at 66.)  The significant fact is that Wilkins called 9-1-1 indicating an emergency situation caused by Keith Wilkins that

---

[5]Plaintiffs, in their response, assert that Defendants arrested them without the requisite probable cause to do so.  (Resp. at 4.)  Defendants contend that, to the extent that Plaintiffs purport to assert distinct Fourth Amendment claims based upon their alleged false arrests, such claims would fail as a matter of law.  (Reply at 3.)  As Defendants aptly note, Plaintiffs' no-contest pleas to charges of assault and battery on a police officer and obstruction based upon the challenged incident preclude any such claims.  *See Walker v. Schaeffer,* 854 F.2d 138, 142 (6th Cir. 1988) (holding that the plaintiff's no-contest plea in his prior criminal case precluded his § 1983 claim for false arrest); *Sandul v. Larion*, 52 F.3d 326 (6th Cir. April 11, 1995)(unpublished opinion)(holding that the plaintiff's no-contest plea to a charge of attempted felonious assault precluded his subsequent § 1983 claim of false arrest for that assault).

4

required immediate police assistance to protect her.

Upon arrival at the Wilkins' residence, Officers Frazier and Moore approached the front door, and McInerny headed to the back door. (McInerny Report at 1; Br. at 1; Resp. at 1; Frazier Report at 1; Moore Report at 1.) After Frazier knocked on the front door, Wilkins answered the door and let Frazier and Moore into the residence.[6] (Br. at 1; Resp. at 1; Frazier Report at 1; Moore Report at 1.) According to Frazier and Moore, the residence was in complete disarray; for example, there were clothes on the floor, and the kitchen chairs and coffee table were turned over. (Frazier Report at 1; Moore Report at 1.) Wilkins testified that no furniture was knocked over, but that she threw Keith Wilkins' clothes on the floor. (Wilkins Dep. at 60.)

### A. Keith Wilkins

Keith Wilkins is not a plaintiff in this action. In the backyard, McInerny observed Keith Wilkins shutting the door of a mini-van and heading towards the residence. (McInerny Report at 1.) According to Defendants, McInerny ordered Keith Wilkins to place his hands on the van so that he could be patted down for weapons, and Keith Wilkins eventually did so. (McInerny Report at 1; Br. at 1; Resp. at 1; Frazier Report at 1.) At this time, Moore and Frazier exited the rear door to the backyard, where they observed McInerny struggling with Keith Wilkins. (Br. at 1; Frazier Report at 1; Moore Report at 1.) McInerny ordered Keith Wilkins to spread his feet apart for the pat-down. (McInerny Report at 1; Frazier Report at 1; Moore Report at 1; Wilkins Dep. at 76.) Indeed, Wilkins testified that, more than once, she heard the police order Keith Wilkins to spread his legs. (Wilkins Dep. at 78.) According to Defendants, Keith Wilkins resisted. (McInerny Report at 1; Br. at 1; Frazier Report at 1; Moore Report at 1.)

---

[6]According to Moore, Wilkins told them that she and her husband, Keith Wilkins, had been fighting. (Moore Report at 1; Br. at 1.)

Defendants contend that Keith Wilkins attempted to turn around to face the officers.[7] (McInerny Report at 1; Frazier Report at 1; Moore at 2.)  The officers struck Keith Wilkins' knees.[8]  (Br. at 1; Resp. at 1; McInerny Report at 1; Frazier Report at 1; Moore Report at 2; Wilkins Dep. at 81-82; Lakeesha Dep. at 32, 36.)  According to Lakeesha Emerson, she heard the officers order Keith Wilkins, whose body was facing the van, to "get down" on the ground. (Lakeesha Dep. at 33.)  McInerny forced Keith Wilkins to the ground.  (McInerny Report at 1; Resp. at 1; Frazier Report at 1; Moore Report at 2; Wilkins Dep. at 82; Tyeesha Dep. at 55.) Wilkins testified that she heard an officer say, "Didn't I tell you to spread your legs?"  (Wilkins Dep. at 85.)

According to Plaintiffs, the officers continued to strike Keith Wilkins with their batons while he was on the ground.  (Wilkins Dep. at 84, 86; Lakeesha Dep. at 38; Tyeesha Dep. at 55, 65; Resp. at 1.)  According to Defendants, Keith Wilkins got up off of the ground despite having officers on top of him, and  threw the officers to the ground.  (McInerny Report at 1; Frazier Report at 1; Moore Report at 2.)  Tyeesha Emerson testified that, after Lakeesha Emerson had jumped on him, Keith Wilkins "was on the ground and then he got to his knees" and then he "want back to the ground again."  (Tyeesha Dep. at 71.)  Moore testified that McInerny pepper-sprayed Keith Wilkins.  (Moore Report at 2.)   Moore then forced Keith Wilkins to the ground. (Frazier Report at 1; Moore at 2.)  According to Moore, Keith Wilkins also cradled his arms

---

[7]Wilkins testified that it was possible that Keith Wilkins turned towards the officers and that she did not see it.  (Wilkins Dep. at 82.)  Tyeesha Emerson testified that she saw one of the officers come out of the residence and push Keith Wilkins against the van, and that Keith Wilkins' back was against the van.  (Tyeesha Dep. at 53-54.)  Tyeesha Emerson testified that she never saw Keith Wilkins facing the van.  (*Id.* at 62.)

[8]Tyeesha Emerson testified that she could not remember if the officers struck Keith Wilkins while he was standing.  (Tyeesha Dep. at 63.)

under his body so that the officers could not handcuff him.  (Moore Report at 2.)

### B.  Lakeesha Emerson

Defendants testified that, while they were struggling to restrain Keith Wilkins, Lakeesha Emerson advanced toward the officers, screaming at the officers to leave Keith Wilkins alone. (Frazier Report at 1; Moore Report at 2; McInerny at 1.)  According to Frazier, he pushed Lakeesha Emerson back, and told her to stay away.  (Frazier Report at 1; but see Wilkins Dep. at 90.)  Lakeesha Emerson jumped on Keith Wilkins' back, holding him around the neck and screaming "leave my daddy alone."  (McInerny Report at 1; Br. at 2; Resp. at 2; Frazier Report at 2; Moore Report at 2-3; Wilkins Dep. at 87-88; Tyeesha Emerson Dep. at 65, 67-68.)  Frazier and Moore were trying to pull Lakeesha Emerson off of Keith Wilkins, and Moore was also struggling to keep Keith Wilkins on the ground.  (Frazier Report at 2; Moore Report at 3.) According to Defendants, during this time, Lakeesha Emerson punched Frazier in the head. (McInerny Report at 2; Br. at 2; Frazier Report at 2; Moore Report at 3.)

Upon seeing that the officers were unable to restrain Keith Wilkins and Lakeesha Emerson, McInerny radioed for back-up assistance.  (McInerny Report at 2.) McInerny pepper-sprayed Keith Wilkins' and Lakeesha Emerson's faces. (McInerny Report at 2; Wilkins Dep. at 90.)  McInerny finally pulled Lakeesha Emerson off of Keith Wilkins. (McInerny Report at 2; Frazier Report at 2.)  According to McInerny, Lakeesha Emerson was "swinging her fists wildly at . . . [his] face," and McInerny protected his face and "punched back at his attacker." (McInerny Report at 2.)

Lakeesha Emerson testified that, after the officers pulled Keith Wilkins to the ground and "started kicking him and taking the stick and hitting him," she jumped on Keith Wilkins' back "to shield him because they were hitting him pretty hard."  (Lakeesha Dep. at 38.)  Lakeesha

7

Emerson further testified that her intent was to protect Keith Wilkins "because they were beating him up" and "were going to kill him." (Lakeesha Dep. at 40-41.)  According to Wilkins and Tyeesha Emerson, after Lakeesha Emerson jumped on Keith Wilkins' back, Defendants began to strike her with their batons.  (Resp. at 2; Wilkins Dep. at 93; Tyeesha Emerson Dep. at 69, 74.)  Lakeesha Emerson testified:

> . . . [T]hey were continuing to kick him and hit him in the legs . . . , and I kept saying stop, please stop, don't hurt him, . . . and that's when one of them had took [sic] their stick and hit me in the face and across the back of my head and on my back or what not.

(Lakeesha Dep. at 38.)  Although Lakeesha Emerson testified that the officers told her to get off of Keith Wilkins, she later recanted this testimony, averring that she did not remember such an order.  (*Id.* at 38, 42-43.)

Tyeesha Emerson saw an officer pull Lakeesha Emerson off of Keith Wilkins and "throw[] her to the side."  (Tyeesha Dep. at 76.)

### C.  Tyeesha Emerson and Wilkins

According to Defendants, at some point during the incident, Wilkins, Tyeesha Emerson, and Carvel Wilkins, a large male, advanced towards the officers as they were trying to restrain Keith Wilkins despite having been ordered to stay back from the officers.  (Br. at 1-3; Resp. at 1, 3; McInerny Report at 1; Frazier Report at 2; Moore Report at 2-3; Wilkins Dep. at 90.)  Specifically, Defendants assert that, upon seeing certain Plaintiffs advance toward the officers, McInerny ordered the group to stay back.  (McInerny Report at 1; Frazier Report at 2; Moore at 2.)  According to McInerny and Frazier, Tyeesha Emerson and Wilkins jumped on Moore's

back, punching Moore and attempting to pull Moore off of Keith Wilkins.[9]  (McInerny Report at 1; Frazier Report at 2; Moore Report at 3; Br. at 2.)  According to McInerny and Frazier, McInerny pulled Wilkins and Tyeesha Emerson off of Moore, and, again, ordered them to stay back.  (McInerny Report at 1-2; Frazier Report at 2.)  According to McInerny and Moore, Tyeesha Emerson and Wilkins again advanced toward Frazier and Moore, and McInerny pepper-sprayed Tyeesha Emerson's and Wilkins' faces.  (McInerny Report at 2; Moore Report at 3.)[10] According to McInerny and Moore, at some point during the incident, Carvel Wilkins advanced towards the officers, and McInerny pepper-sprayed his face. (McInerny Report at 2; Moore at 3; Br. at 2.)

Wilkins testified that after Lakeesha Emerson jumped on Keith Wilkins' back, Wilkins and Tyeesha Emerson moved towards them.  (Wilkins Dep. at 87-90.)  Wilkins also testified that, because she knew that they should not have been approaching the officers, she was telling her children to go back into the residence. (*Id.* at 90, 94.)

Tyeesha Emerson testified that, when Tyeesha Emerson and Wilkins moved towards Keith Wilkins and the officers after Lakeesha Emerson did so, an officer told them to get back. (Tyeesha Dep. at 71, 79.)  Tyeesha Emerson testified that, after receiving that order, she and Wilkins stayed close to the back door.  (*Id.* at 74.) Wilkins testified that she "[s]tood outside nearby [her] husband and Lakeesha" Emerson, asking the officers to stop hurting them.  (Wilkins

---

[9]While Defendants and Moore assert that Tyeesha Emerson jumped on Moore's back (Moore 3; Br. at 2), McInerny's and Frazier's report state that it was both Tyeesha Emerson and Wilkins who jumped on Moore's back (McInerny Report at 1; Frazier Report at 2.).  Moreover, Moore's report states that Tyeesha Emerson jumped on Moore's back after she was pepper-sprayed.  (Moore Report at 3.)

[10]While Moore refers to Wilkins and Lakeesha Emerson, he, presumably, intends to refer to Wilkins and Tyeesha Emerson since it is undisputed that Lakeesha Emerson was on Wilkins' back. (Moore Report at 3.)

Dep. at 94-95.)  Wilkins further testified that the officers told her to shut up and sit on the grass, and that she did so. (*Id.* at 95.)

Tyeesha Emerson testified that Carvel Williams said "stop, stop, and . . . ran, and one of the officers . . . pepper-sprayed him." (*Id.* at 77, 78.)  As Wilkins testified, while Carvel Wilkins "stood over" the officers and was near Keith Wilkins, questioning the officers about what they were doing to Keith Wilkins, Carvel Wilkins got pepper-sprayed.  (Wilkins Dep. at 91-92.) Tyeesha Emerson testified that she got pepper-"sprayed lightly" and that it was not "directed towards" her.  (*Id.* at 81.)  Tyeesha Emerson got pepper spray in her eyes when Carvel Wilkins was pepper-sprayed.  (Wilkins Dep. at 91-92; Tyeesha Dep. at 79.)

### D.  Arrests & Post-Arrests

With the help of back-up assistance, the officers arrested Plaintiffs.  (McInerny Report at 2; Frazier Report at 2; Moore Report at 3; Wilkins Dep. at 95.)

### 1.  Tyeesha Emerson

Tyeesha Emerson testified that, after she was pepper-sprayed for the second time, officers threw her to the ground, rolled her onto her stomach, and put a boot in her back so that they could put her hands behind her back to handcuff her.  (Tyeesha Dep. at 83-85, 93.) According to Tyeesha Emerson, after handcuffing her, the officers "dragged" her to a squad car. (*Id.* at 84-85.)  As Tyeesha Emerson explained, the officers, who were telling her to walk because she was stumbling and not on her feet all the way, were holding her so that, when she stumbled, she did not fall face-down onto the ground.  (*Id.* at 86.)

Tyeesha Emerson testified that, while she was at the station, the pepper spray was flushed from her eyes.  (*Id.* at 87-88.)  According to Tyeesha Emerson, she has two scars on her leg from having been thrown to the ground.  (*Id.* at 89.)

### 2. Wilkins

Wilkins testified that, after being pepper-sprayed, she was placed in handcuffs and put in a squad car.  (Wilkins Dep. at 97, 105.)  Wilkins testified that, while at the hospital, the pepper spray was flushed from her eyes, and that this was the only medical treatment that she received for any injuries arising from the challenged incident.  (*Id.* at 116, 118.)  According to Wilkins, being pepper-sprayed caused her to lose her vision for about a week.  (*Id.* at 111.)  Wilkins further testified, however, that she did not sustain any other injuries.  (*Id.*)  Wilkins testified that, as of the day after the incident, her eyes were red and swollen.  (*Id.* at 112.)

### 3. Lakeesha Emerson

Lakeesha Emerson testified that the officers "dragged" her into a squad car with Wilkins. (Lakeesha Dep. at 43.)  As to while she was in the squad car, Lakeesha Emerson testified:

> I started shaking even more, crying, and I–my head was hurting really bad and I just started convulsing and that's what my–my mother said, 'She needs to go to the hospital, she's convulsing, she's convulsing.'
>
> And it took the officers a couple seconds to come check on me and I was still shaking and then that's when two officers dragged me out across the pavement and I lost a sock and had scratches on my legs and then they threw me on the cement and said 'What's wrong with you?'
>
> And I said, I'm hurting, or whatever.
>
> And then . . . they said, [y]ou're a liar.  When you convulse[,] you don't talk or you can't talk . . . .

(*Id.* at 44.)

Lakeesha Emerson testified that she was transported, by ambulance, to a hospital, where she was strapped down due to her seizure-like shaking, pepper spray was flushed from her eyes, and she received a CAT scan. (Lakeesha Dep. at 44.)  According to Defendants, Lakeesha Emerson was treated for "minor injuries," and was released.  (McInerny Report at 2; Moore

11

Report at 3.)  Wilkins testified that, as of the day after the incident, Lakeesha Emerson had bruises on her feet, face, and arms.  (Wilkins Dep. at 113-14.)

### 4.  Criminal Conduct of Plaintiffs Based on their Conduct at the 9-1-1 Incident at Issue

Wilkins, Tyeesha Emerson, and Lakeesha Emerson pleaded no contest to charges of assault and battery on a police officer and obstruction during the incident.  (Wilkins' Dep. at 32-33, Ex. 2; Resp. at 2; Reply at 3.)  Officer Frazier was treated at the hospital for "swelling and bruising" over his left eye, and was released.  (Frazier Report at 2.)

## III.  ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "material" fact is one "that might affect the outcome of the suit under the governing law[.]"  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A "genuine" issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  In deciding a motion for summary judgment, the Court must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* at 586.

To state a claim under 42 U.S.C. § 1983 against a defendant in his individual capacity, the plaintiff must show that the defendant deprived him of a federal right while acting under

color of state law.[11]  *Sperle v. Mich. Dep't of Corrections,* 297 F.3d 483, 490 (6th Cir. 2002).

The Fourth Amendment and its "reasonableness" standard govern "all claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest, investigatory stop, or other 'seizure" of a free citizen." *Graham v. Connor,* 490 U.S. 386, 395 (1989) (emphasis omitted).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396.  The Supreme Court's "jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.*  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.*(quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)(internal citation omitted).  Rather, the reasonableness calculus must make "allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

A proper application of the Fourth Amendment's "reasonableness" test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a

---

[11]Defendants concede that, at the time of their challenged conduct, they were acting under color of state law.  (Br. at 3.)

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*   Moreover, the reasonableness inquiry is "an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

Defendants maintain that they are entitled to summary judgment on Plaintiffs' § 1983 claims against them because they, as a matter of law, did not violate Plaintiffs' Fourth Amendment rights to be free from excessive force.  (Br. at 5.)  In support, Defendants underscore that they were dispatched to Wilkins' residence because of her 9-1-1 emergency call for a "domestic assault in progress," and that such emergency domestic situations "present great dangers to responding officers."  (Ex. 1; Br. at 5.)  *See Tierney v. Davidson,* 133 F.3d 189, 197 (2d Cir. 1989) (noting the combustible nature of domestic disputes).  Defendants argue that, upon seeing the officers attempt to restrain and to arrest Keith Wilkins, Plaintiffs "decided to intervene and interfere with the officers' attempts to control" him even though they were reasonably ordered to keep away from the officers.  (*Id.* at 8.)  Defendants assert, in essence, that the amount of force that they inflicted upon Plaintiffs was reasonable based upon Plaintiffs' failure to comply with that order.  Plaintiffs, in turn, contend that  genuine issues of material fact exist as to whether the force that Defendants inflicted upon Plaintiffs was excessive.  (Resp. at 2.)

Under Michigan law, even if Defendants' arrest of Keith Wilkins was unlawful or if they were inflicting excessive force upon him, Plaintiffs had no right to intervene on his behalf; rather, only Keith Wilkins would have had the right to use physical force to resist any such unlawful arrest.  *See Darrah v. City of Oak Park,* 255 F.3d 301, 312-13 (6th Cir. 2001).  In *Darrah,* the Sixth Circuit stated:

14

> . . . [U]nder Michigan law, while arrestees have the right to use physical force to resist an unlawful arrest, third party intervenors do not. Thus, even though [Officer] Bragg may have used force against Dearmond when attempting to handcuff him that the plaintiff considered excessive, plaintiff had no right under Michigan law to resort to physical force against Officer Bragg in an attempt to aid Dearmond.

*Id.* at 312-13 (internal citation omitted). In the instant case, there is no question that Plaintiffs intervened against the officers as they were arresting Keith Wilkins, who was the subject of the 9-1-1 emergency call by Wilkins. Further, there is no question that Plaintiffs pleaded *nolo contendere*, the equivalent of guilty, for their conduct against the police officer defendants.

The doctrine of qualified immunity affords "not a defense to liability," but, rather, "an immunity from suit altogether . . . to avoid [the] burdens of [the] costs of trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). Under the qualified-immunity doctrine, government officials performing discretionary functions are not liable for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). In determining whether a government official is entitled to qualified immunity, a court must first determine whether the facts alleged, when viewed in the light most favorable to the party asserting the injury, show that the public official's conduct violated a constitutional right, and, if so, whether that right was so clearly established that a reasonable official would understand that his particular conduct would violate that right. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).

As to the latter inquiry, a government official is entitled to qualified immunity where he "acted under the objectively reasonable belief that his or her actions were lawful." *Ahlers v. Schebil,* 188 F.3d 365, 373 (6th Cir. 1999) (citing *Harlow*, 457 U.S. at 815-19.) In *Brosseau v. Haugen,* 125 S.Ct. 596, 599 (2004), the Supreme Court elaborated that "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient,

reasonably misapprehends the law governing the circumstances [that] she confronted." The

United States Court of Appeals for the Sixth Circuit recently explained *Brosseau* as follows:

> Because the focus is on whether the officer had fair notice that her conduct was
> unlawful, . . . reasonableness is judged against the backdrop of the law at the time
> of the conduct. If the law at that time did not clearly establish that the officer's
> conduct would violate the Constitution, the officer should not be subject to
> liability or, indeed, even the burdens of litigation. *Brosseau* leaves open two
> paths for showing that officers were on notice that they were violating a clearly
> established constitutional right–where the violation was sufficiently obvious
> under the general standards of constitutional care that the plaintiff need not show
> a body of materially similar case law, and where the violation is shown by the
> failure to adhere to a particularized body of precedent that squarely govern[s] the
> case here.

*Lyons v. City of Xenia,* – F.3d –, No. 99-00603, 2005 WL 1846994, at *11 (6th Cir. Aug. 4, 2005)

(internal quotation marks and citations omitted).

Defendants maintain that they are entitled to qualified immunity on Plaintiffs' § 1983

claims against them and, thus, to summary judgment on those claims. Specifically, Defendants

contend that, even if they were to have violated Plaintiffs' Fourth Amendment rights to be free

from excessive force, reasonable officials in Defendants' positions would have believed that

their actions were lawful. (Br. at 12-13.) Once again underscoring the great danger to

responding police officers that domestic-abuse situations pose, Defendants argue that "Plaintiffs

were advancing in a threatening manner toward the officers as they tried to control Keith

Wilkins"; "Plaintiffs ignored orders to stay away from the incident"; and "Plaintiffs were trying

to interfere with the officers['] performance of their duties." (Reply at 4.) Citing solely to the

seminal excessive-force case of *Graham v. Connor,* 490 U.S. 386 (1989), Plaintiffs, in turn,

maintain that reasonable officials in Defendants' positions would have known that their conduct

amounted to excessive force. (Resp. at 4.)

**A.  Tyeesha Emerson**

16

As to Plaintiff Tyeesha Emerson, in particular, Defendants argue that her allegations that she was sprayed twice in the face with pepper spray, pushed to the ground, and pulled to the patrol car do not, as a matter of law, constitute excessive force.  (Br. at 8.)

As Defendants point out, Tyeesha Emerson testified that, the *first time* that she was pepper-sprayed, the spray was not directed at her and was "light." (Tyeesha Emerson Dep. at 81) *See Stevenson v. Koskey,* 877 F.2d 1435, 1441 (9th Cir. 1989) (holding that conduct that is simply inadvertent or negligent does not rise to the level of a constitutional violation).  Defendants' inadvertent and "light" pepper-spraying of Tyeesha Emerson while they were pepper-spraying Carvel Wilkins did not violate Tyeesha Emerson's Fourth Amendment rights.

Relying upon their incident reports in support, Defendants contend that they pepper-sprayed Tyeesha Emerson the *second time* only after she ignored the officers' directive to stay back.  (Br. at 8.)  *See Monday v. Oullette,* 118 F.3d 1099, 1104-1105 (6th Cir. 1997) (affirming the reasonableness of the use of pepper spray against a large, intoxicated man who refused to comply with the police officer's directive).  Defendants underscore that Tyeesha, in fact, admitted that the officers told her and Wilkins to "get back."  (Tyeesha Emerson Dep. at 71.) However, Tyeesha Emerson testified that, at the time that she and Wilkins were pepper-sprayed, they were standing still on the platform near the rear door.  (Tyeesha Dep. at 83.)  Tyeesha Emerson testified that, although she had not been advancing towards the officers at the time that she was pepper-sprayed for the second time, she had advanced towards them previously–after Lakeesha Emerson had moved towards the officers and jumped on Keith Wilkins' back. (Tyeesha Dep. at 71, 74, 79; *see also* Wilkins Dep. at 87-90.)  Tyeesha Emerson and Wilkins testified that they were "screaming" at the officers to stop choking Keith Wilkins despite the officers' earlier directives to "shut up."  (Wilkins Dep. at 95-96, 99, 105; Tyeesha Dep. at 75-77,

17

83, 93.)

Several incident reports indicate that, before being pepper-sprayed for the second time–although not immediately before–, Tyeesha Emerson–along with Wilkins–jumped on Moore and began punching him.  (McInerny Report at 1-3; Frazier Report at 2; Moore Report at 3.)  Tyeesha Emerson, in contrast, testified that neither she nor Wilkins ever jumped on an officer's back or punched an officer.  (Tyeesha Dep. at 81-82; *see also* Wilkins Dep. at 96.)  However, Tyeesha Emerson pleaded no contest to charges of assault and battery on a police officer and obstruction. (Wilkins' Dep. at 32-33, Ex. 2; Resp. at 2; Reply at 3.)  Thus, Tyeesha Emerson's no-contest plea to assault and battery under Michigan law precludes her from denying the facts underlying that conviction–i.e. that she, in fact, assaulted and battered Moore–for purposes of her § 1983 excessive-force claims.  *See Sandul v. Larion,* No. 94-1233, 1995 WL 216919 at *6 (6th Cir. April 11, 1995) (unpublished opinion) (holding that the plaintiff could not dispute the fact that he had threatened an officer for purposes of a § 1983 claim because he had pleaded no contest to attempted felonious assault under Michigan law).

Viewing the facts in the light most favorable to Tyeesha Emerson, at issue is whether Defendants' pepper-spraying of Tyeesha Emerson while she was standing in the backyard near the rear door, pursuant to the officers' directives, and was screaming at the officers to stop hurting Keith Wilkins, contrary to the officers' earlier order to "shut up," after she had previously jumped on Moore's back and punched him, violated Tyeesha Emerson's Fourth Amendment rights and, if so, whether reasonable officers in Defendants' positions would have known that such actions were unlawful.

The Court concludes that Defendants' pepper-spraying of Tyeesha Emerson for the second time did not rise to the level of excessive force.  Even if such conduct somehow

18

constituted excessive force, reasonable officials in Defendants' positions would have believed that their actions were lawful.  Reasonable officials in Defendants' positions would have believed that Tyeesha Emerson's screaming, contrary to the officers' direct order, could have escalated the already-chaotic situation and prevented the officers from attaining order.  Most importantly, reasonable officials would have believed that Tyeesha Emerson's insubordinate screaming could well have escalated to her, once again, advancing towards the officers and committing another battery, and that pepper-spraying her was necessary to dissuade her from doing so.  Tyeesha Emerson, as a matter of law, has failed to demonstrate a Fourth Amendment violation that was "sufficiently obvious under the general standards of constitutional care" or that consists of a "failure to adhere to a particularized body of precedent that squarely govern[s] the case here."  *Lyons,* 2005 WL 1846994 at * 11 (internal quotation marks and citations omitted).

According to Tyeesha Emerson, after she was pepper-sprayed the second time, the officers pushed her down to the ground and rolled her onto her stomach so that they could put her hands behind her back and handcuff her.  Tyeesha Emerson testified that, after the officers handcuffed her, they "dragged [her] . . . to the car."  Tyeesha Emerson explained that two officers, one on each side of her, held her up so that, as she stumbled toward the police car, she did not fall face down onto the ground and that the officers were telling her to walk.  (Tyeesha Emerson Dep. at 85-86.)  Even when viewing the facts in the light most favorable to Tyeesha Emerson, the manner in which Defendants took her into custody did not constitute excessive force.  Tyeesha Emerson's § 1983 claims fail as a matter of law.

### B.  Wilkins

Regarding Wilkins, Plaintiffs assert that, along with being pepper-sprayed, Wilkins was

struck with a baton. (Resp. at 2, 4.)  According to Frazier, he "delivered a forward cutting strike" with his baton, striking Wilkins in the leg.  (Frazier Report at 2; *see also* Tyeesha Dep. at 80.) However, Wilkins herself testified that, other than being pepper-sprayed, she did not sustain any injuries. (Wilkins Dep. at 111.)  Defendants did not violate Wilkins' Fourth Amendment rights by striking her with a baton.

As to the pepper-spraying of Wilkins, Defendants maintain that such conduct did not, as a matter of law, constitute excessive force.  (Br. at 9.)  Defendants argue that, other than having her eyes flushed out, Wilkins did not suffer any serious injuries from being pepper-sprayed. (Wilkins Dep. at 118; Br. at 9.)  Yet, Wilkins testified that being pepper-sprayed caused her to lose her vision for about a week.  (Wilkins Dep. at 111.)

Defendant further argue that they pepper-sprayed Wilkins only after she disobeyed their order to stay back.  (Br. at 9; Reply at 3.)  As Plaintiffs aptly note, however, Tyeesha Emerson testified that, at the time that she and Wilkins were pepper-sprayed, they were standing still on the platform near the rear door.  (Tyeesha Dep. at 83.)  Wilkins testified that, although she had not been advancing towards the officers at the time that she was pepper-sprayed, she had advanced towards them previously–after Lakeesha Emerson had moved towards the officers and jumped on Keith Wilkins' back.  ( Wilkins Dep. at 87-90; Tyeesha Dep. at 71, 74, 79.)  Wilkins herself testified that she was complying with the officers' request to stay away from them. (Resp. at 4; Wilkins Dep. at 95.)  On the other hand, Tyeesha Emerson and Wilkins testified that they were yelling at the officers despite the officers' earlier directives to "shut up."  (Wilkins Dep. at 95-96, 99, 105; Tyeesha Dep. at 75-77, 83, 93.)

As noted above, several incident reports indicate that, before being pepper-sprayed–although not immediately before–, Wilkins–along with Tyeesha Emerson–jumped on

Moore and began punching him.  (McInerny Report at 1-3; Frazier Report at 2; Moore Report at 3.)  Wilkins testified that she never physically interfered with Defendants' attempt to arrest Keith Wilkins.  (Wilkins Dep. at 96; *see also* Tyeesha Dep. at 81-82.)   However, Wilkins also pleaded no contest to charges of assault and battery on a police officer and obstruction. (Wilkins' Dep. at 32-33, Ex. 2; Resp. at 2; Reply at 3.)  Thus, as with Tyeesha Emerson, Wilkins' no-contest plea to assault and battery under Michigan law precludes her from denying the facts underlying that conviction–i.e. that she, in fact, assaulted and battered Moore–for purposes of her § 1983 excessive-force claims.  *See Sandul,* 1995 WL 216919 at * 6.

Viewing the facts in the light most favorable to Wilkins, at issue is whether Defendants' pepper-spraying of Wilkins while she was standing in the backyard near the rear door, pursuant to the officers' directives, and was screaming at the officers to stop hurting Keith Wilkins, contrary to the officers' earlier order to "shut up," after she had previously jumped on Moore's back and punched him, violated Wilkins' Fourth Amendment rights and, if so, whether reasonable officers in Defendants' positions would have known that such actions were unlawful.

The Court concludes that Defendants' pepper-spraying of Wilkins did not rise to the level of excessive force.  Even if such conduct somehow constituted excessive force, reasonable officials in Defendants' positions would have believed that their actions were lawful. Reasonable officials in Defendants' positions would have believed that Wilkins' screaming, contrary to the officers' direct order, could have escalated the already-chaotic situation and prevented the officers from attaining order.  Most importantly, reasonable officials would have believed that Wilkins' insubordinate screaming could have escalated to her, once again, advancing towards the officers and committing another battery, and that pepper-spraying her was necessary to dissuade her from doing so.  Wilkins, as a matter of law, has failed to demonstrate a

Fourth Amendment violation that was "sufficiently obvious under the general standards of constitutional care" or that consists of a "failure to adhere to a particularized body of precedent that squarely govern[s] the case here." *Lyons*, 2005 WL 1846994, at * 11 (internal quotation marks and citations omitted). Wilkins' § 1983 claims fail as a matter of law.

### C. Lakeesha Emerson

As to Lakeesha Emerson, Defendants argue that the force that they inflicted upon her was not excessive as a matter of law. (Br. at 9-10.) Defendants note that, despite having been told to get back, Lakeesha Emerson ran and jumped on Keith Wilkins' back as Defendants were attempting to arrest him, interjecting herself into and obstructing Defendants' attempts to do so. (*Id.* at 9-10; Reply at 1; Wilkins Dep. at 94; Tyeesha Dep. at 68-69, 77.)

Several incident reports indicate that, while on Keith Wilkins' back, Lakeesha Emerson punched Frazier in the head. (McInerny Report at 2; Frazier Report at 2; Moore Report at 3.) Indeed, after the incident, Frazier was treated at the hospital for "swelling and bruising" over his left eye. (Frazier Report at 2.) Without citing to any evidentiary support, Lakeesha Emerson cursorily contends that she never struck Frazier or any other officer. (Resp. at 2-3.) However, Lakeesha Emerson pleaded no contest to charges of assault and battery on a police officer and obstruction. (Wilkins' Dep. at 32-33, Ex. 2; Resp. at 2; Reply at 3.) This means that she admitted criminal culpability for assault and battery on a police officer and for obstruction–all in the context of the instant case.

Viewing the facts in the light most favorable to Lakeesha Emerson, the relevant analysis would consider whether Defendants' use of force against Lakeesha Emerson while she had jumped into the fray and was laying on top of Keith Wilkins–contrary to the officers' orders to stay back–, and was punching Frazier in the head, violated her Fourth Amendment rights and, if

so, whether reasonable officers in Defendants' positions would have known that such actions

were unlawful.  The recent Sixth Circuit decision in *Cummings v. City of Akron,* – F.3d –, No.

03-3259, 2005 WL 1903745, at ** 3-4 (6th Cir. July 22, 2005), counsels that the doctrine set

forth in *Heck v. Humphrey*, 512 U.S. 477 (1994) bars Lakeesha Emerson's § 1983 excessive-

force claims.  The *Heck* doctrine "bars § 1983 plaintiffs from advancing claims that, if

successful, 'would necessarily imply the invalidity' of a prior conviction or sentence."  *Id.* at 4

(quoting *Heck*, 512 U.S. at 487).  Lakeesha Emerson's § 1983 excessive-force claims and her no-

contest conviction for assault and battery are "inextricably intertwined" because they arose out

of Lakeesha Emerson and Defendants' on-going struggle while she was on Keith Wilkins' back.

*See id.* at 5.  Moreover, Lakeesha Emerson never raised Defendants' use of excessive force as a

defense to the assault-and-battery charge.  *See id.*; *People v. Dillard,* 115 Mich. App. 640, 641

(1982) (holding that, under Michigan law, an individual "has a right to defend himself in

resisting an unlawful arrest so long as the force used was reasonably necessary").  Thus,

following *Cummings*, Lakeesha Emerson's § 1983 claims would necessarily imply the invalidity

of her assault-and-battery conviction.  Lakeesha Emerson's § 1983 claims fail as a matter of law.


## IV. SUMMARY

For the preceding reasons, the Court GRANTS the individual Defendants' motion for

summary judgment on all of Plaintiffs' §1983 claims.

Moreover, because Plaintiffs have failed, as a matter of law, to establish that the

individual Defendants violated Plaintiffs' Fourth Amendment rights in the first instance,

Plaintiffs' remaining §1983 claims against Defendant City necessarily fail.  *See Monell v. Dep't

of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978) (holding that a plaintiff must

establish a deprivation of his constitutional rights for a municipality to be liable under § 1983).

Accordingly, the Court DISMISSES WITH PREJUDICE Plaintiffs' §1983 claims against the

City of Royal Oak.

Furthermore, having dismissed all claims over which the Court has original jurisdiction,

the Court DECLINES to exercise pendent jurisdiction, under 28 U.S.C. § 1367, over Plaintiffs'

remaining state-law claims.  *See Hankins v. The Gap, Inc.,* 84 F.3d 797 (6th Cir. 1996).

SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 17, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
August 17, 2005.

s/Jonie Parker
Case Manager